```
                IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ILLINOIS
                          EASTERN DIVISION
```

| | |
|---|---|
| Joshua Houston, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 16 C 8646 |
| | ) |
| Village of Calumet Park, et al., | ) |
| | ) |
| Defendants. | ) |

### Memorandum Opinion and Order

In September of 2014, plaintiff Joshua Houston was arrested and charged with the murder of Anthony McMillen. He was incarcerated for seventeen months before prosecutors dismissed the charge on the eve of trial, after witnesses recanted their testimony or refused to testify against him. Houston then filed this action claiming that the defendant police officers conspired to frame him for McMillen's murder and caused him to be arrested and imprisoned in violation of his rights under the Fourth Amendments of the United States Constitution and Illinois common law.[1] He names as defendants the Cities of Oak Forest and Blue

---

[1] The SAC also makes a stray reference to the Fifth and Fourteenth Amendments, but I do not read the complaint as articulating a claim under these amendments. Indeed, *Manuel v. City of Joliet*, 137 S.Ct. 911 (2017), "makes clear that the Fourth Amendment, not the Due

1

Island, Illinois; the Villages of Calumet Park, Burnham, Lansing, and South Holland, Illinois; and individual officers of these municipalities whose conduct he claims was unlawful. Before me is defendants' joint motion to dismiss the complaint in its entirety. For the reasons that follow, the motion is granted.

I.

According to the second amended complaint ("SAC") filed on April 20, 2017, plaintiff—whom the complaint describes only as "an eighteen-year old black student"—was standing with his friends, Keenan Holden, Antoine Hull, Devonte Jenkins, Jarod Houston, Marshawn Johnson, and Eric Neely, on a sidewalk near 126th Street and Elizabeth Street in the Village of Calumet Park on September 1, 2014. SAC at ¶¶ 1-2. A car approached the group, and Holden spit on the driver through the open window. Shortly thereafter, the driver's brother, Anthony McMillen, approached the group and asked, "who spit on my sister?" As McMillen reached toward his waistband, someone from the group shot and killed him. *Id*. at ¶¶ 31, 33.

The gravamen of plaintiff's complaint is that defendants knew he was not the shooter but decided to pin the crime on him anyway. The SAC channels this theory into ten separate counts, captioned as follows: Count I-Fourth Amendment Unlawful Pretrial Detention;

---

Process Clause, governs a claim for wrongful pretrial detention." *Lewis v. City of Chicago*, 914 F.3d 472, 475 (7th Cir. 2019).

Count II-Fourth Amendment False Arrest; Count III-Fourth Amendment Malicious Prosecution; Count IV-Failure to Intervene 42 U.S.C. § 1983; Count V-Conspiracy 42 U.S.C. § 1983; Count VI-Malicious Prosecution; Count VII-Intentional Infliction of Emotional Distress; Count VIII-Conspiracy; Count IX-Respondeat Superior; and Count X-Indemnification. In support of these claims, plaintiff recounts the following facts.

At the Calumet City Police Department's request, the South Suburban Major Crime Task Force ("SSMCTF")—an organization that comprises over fifty-four South Suburban Police Departments—began investigating McMillen's murder by dispatching various officers to the scene. Defendant David Nedved interviewed witness Tabitha Burton. *Id*. at ¶ 43. Burton reported that after hearing yelling outside her Elizabeth Street home, she looked out her front window and observed a black man walk in front of a black Monte Carlo and fire a gun at McMillen. She then saw the shooter and another black man run eastbound toward the alley between two homes. A third individual—"a male black with dreadlocks"—then approached McMillen and shot him in the head before leaving the scene in the Monte Carlo. *Id*. at ¶¶ 44-45.

Nedved and defendant Chuck Leyden also interviewed Sandra Brown, another resident of Elizabeth Street. SAC at ¶ 55. Brown allegedly told the officers that after hearing gunshots, she looked out her front window and saw two black men running northbound,

3

away from her house, with one suspect holding a gun. SAC at ¶¶ 55-56. The officers' interview notes state that Brown did not know if she could identify the individual with the gun. *Id*. at 56. According to the SAC, Nedved and Leyden "changed" Brown's observations in their police report to state that the men she saw were running southbound, not northbound, and that they ran past the side of her house. The reason for these changes, plaintiff claims, is that defendants "knew" Brown "could not 'positively' identify the suspects if they were running northbound away from her house." *Id*. at ¶ 58. The report states that Brown described two light-skinned individuals, 5'8" to 5'10" tall, with short hair, one of whom was holding a handgun. *Id*. at ¶ 59.[2]

The following day, September 2, 2014, both Burton and Brown viewed photograph spreads and physical lineups to try to identify suspects. Burton was brought to the Calumet Park Police Department, where she allegedly saw plaintiff's brother, Jarod Houston,[3] and

---

[2] The SAC describes statements by a third witness, Theophilus Stanton, who allegedly reported hearing four gunshots then seeing three individuals with dreadlocks flee from the scene. SAC at ¶¶ 38-42. But none of the officers sued in this case is alleged to have had any contact with Stanton or even to have known the contents of his statements. Accordingly, even assuming that Stanton's statements are exculpatory, they do not support plaintiff's theory that defendants knew he was not McMillen's killer or his argument that they "withheld" Stanton's observations from the grand jury. *See* Resp. at 4-5. Indeed, I can discern no way in which the statements plaintiff attributes to Stanton are relevant to his claim against any defendant.

[3] The SAC does not say who Jarod Houston is, but defendants' motions describes him as plaintiff's brother. Plaintiff's counsel

4

told "Officer Summers" and "ASA Spirrizi" (neither a defendant here) that Jarod "look[ed] just like" the man with dreadlocks who shot McMillen and drove off in the Monte Carlo.[4] SAC at ¶ 48. Burton viewed a physical lineup that included plaintiff, but she did not identify him as one of the shooters. *Id*. at ¶ 52. Brown, for her part, viewed two photograph spreads that included plaintiff but did not identify him as the individual she saw holding a gun. *Id*. at ¶¶ 60-61. Thereafter, however, Brown picked plaintiff out of a physical lineup as the person she saw with the gun. *Id*. at ¶ 62.

According to the complaint, however, these identification procedures were manipulated to make it more likely that Burton and Brown would identify plaintiff as the shooter. Plaintiff claims that Nedved "prevented Ms. Burton from participating in a photograph or physical lineup that included Jarod Houston despite her positively identifying him as one of the shooters" and also "prevented [her] from participating in a photograph or a physical lineup that included Keenan Holden, Eric Neely, or Devonte Jenkins because [he] knew she would identify one of them as the shooter." *Id*. at ¶¶ 50, 53. Similarly, Officers Nedved and Leyden "prevented"

---

confirmed at oral argument that the two are brothers. Tr. of 06/13/2019 Hr'g. at 14:6-7.
[4] Plaintiff does not allege that Burton told any defendant that Jarod looked like the shooter or assert any factual basis for inferring that any defendant knew about Burton's statement to Summers and Spirrizi.

5

Brown from viewing photographs or a physical lineup that included Holden, Neely, or Jenkins "because she would likely identify one of them as the suspect holding the gun." *Id.* at ¶ 63. And during the physical lineup before Brown, Nedved and Leyden "called Plaintiff individually to the two-way mirror in an overly suggestive and coercive manner," leading to Brown's identification of him as the gun-holder. *Id.* at ¶ 62. Plaintiff claims that these identification procedures were part of "a concerted effort to falsely arrest and charge Plaintiff with the murder of McMillen." *Id.* at ¶¶ 63-64.

According to the SAC, SSMCTF officers interrogated Keenan Holden several times during their investigation. During his initial interview on the day of the incident, Holden admitted to defendant Gregory Okon and other officers that he had spit on the woman in the car, but he denied any knowledge of the shooting. SAC at ¶ 66. Okon allegedly "threatened Holden with physical violence and stated that he would be charged with McMillen's murder if he did not 'identify' the shooter." SAC at ¶ 67. Thereafter, Holden stated that as he was leaving the scene, he saw plaintiff fire a blue steel revolver at McMillen. Holden also stated that he and plaintiff left the scene in a vehicle, and that plaintiff discarded the gun on Racine Avenue. *Id.* at ¶ 68. Plaintiff claims that these statements were false, and that "continued investigation" by Okon and others revealed inaccuracies in Holden's account. *Id.* at ¶ 69.

(The complaint does not say when these "inaccuracies" were discovered.)

In the afternoon of September 2, 2014, defendant Calumet Park Police Officer Mario Smith and other officers arrested plaintiff for murder. SAC at ¶ 81. Plaintiff was transported for questioning to the Blue Island Police Department, where he consistently "denied any involvement in the shooting death of McMillen." *Id*. at ¶ 83. Meanwhile, in further interviews conducted the evening of September 2, 2014, Holden allegedly provided "an accurate statement of what occurred," telling officers (though not any named in this suit) that "Debo," i.e., Jenkins, fired a gun at McMillen before fleeing in a vehicle along with Johnson, Hull, and one Malcolm Shorters. *Id*. at ¶¶ 70-72. Realizing that Holden's "accurate statement" would "jeopardize their decision to arrest Plaintiff as the shooter," however, defendants Okon, Daley, and Rodriguez continued Holden's interrogation the following day, September 3, 2014. *Id*. at ¶ 75. During that interrogation, these defendants "threatened Holden with physical violence and stated that he would be charged with murder if he failed to identify Plaintiff as the shooter," and they allegedly fed him a "description of the alleged murder weapon" based on a photograph recovered from another suspect's cellphone. *Id*. at ¶ 76-77. (The SAC does not say what statements, if any, Holden made as a result of these threats and suggestions.) Electronic searches conducted

7

between September 2 and September 4, 2014, of various individuals' cellular phones allegedly produced no evidence that plaintiff was the shooter. *Id*. at ¶ 84.

On September 4, 2014, the Cook County State's Attorney's Office ("CCSAO") approved a murder charge against plaintiff. SAC at ¶ 86. According to the SAC, "[t]he CCSAO decision to approve murder charges against Plaintiff was a result of Defendants['] purposeful and malicious conduct of falsifying reports, fabricating evidence, and deliberately withholding or concealing exculpatory evidence in a concerted effort to mislead and misdirect the criminal prosecution of Plaintiff." *Id*. The prosecutor subpoenaed Burton, Brown, and Holden to testify at plaintiff's trial on January 13, 2016; but on the day of trial, each of these witnesses "either recanted their prior statements or restated Plaintiff's lack of involvement in the shooting." *Id*. at ¶ 89. Accordingly, the CCSAO dismissed all charges against him. This lawsuit followed.

II.

A central theme of defendants' motion to dismiss is that the allegations in the SAC establish affirmatively that probable cause existed for plaintiff's arrest and detention, eviscerating the bulk of his claims. Indeed, probable cause "is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest, false imprisonment, or malicious prosecution."

8

*Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006); *see also Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 626 (7th Cir. 2010) (same under Illinois law). That the officers "allegedly acted upon a malicious motive" does not alter this rule. *Mustafa*, 442 F.3d at 547. A plaintiff asserting such claims may plead herself out of court by alleging facts that establish the existence of probable cause. *See Mayo and Burt v. LaSalle Cnty., et al.*, No. 18 CV 01342, 2019 WL 3202809, at *6 (N.D. Ill. July 15, 2019) (Tharp, J.).

Probable cause 'is a common-sense inquiry requiring only a probability of criminal activity; it exists whenever an officer or a court has enough information to warrant a prudent person to believe criminal conduct has occurred.'" *Leaver v. Shortess*, 844 F.3d 665, 669 (7th Cir. 2016) (quoting *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010)). "The officers must have more than a bare suspicion that they have the right guy, but they need not have enough evidence to support a conviction or even to show that their belief is more likely true than false." *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010). Indeed, probable cause is a "low bar," *Rainsberger v. Benner*, 913 F.3d 640, 649 (2019). The testimony of even one reasonably believable eyewitness is generally sufficient. *See, e.g., Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 439 (7th Cir. 1986). The probable cause analysis focuses on what officers knew at the time of the arrest.

9

"The fact that an officer later discovers additional evidence unknown to her at the time of the arrest, even if it tends to negate probable cause, is irrelevant." *Reynolds v. Jamison*, 488 F.3d 756, 765 (7th Cir. 2007).

While not all of the events alleged in the complaint can be placed in precise sequential order, plaintiff's recitation establishes that by the time he was arrested on the afternoon of September 2, 2014, defendants had the following information pointing to his involvement in McMillen's murder: McMillen was shot during an altercation with a group of friends that included plaintiff;[5] at least one witness, Sandra Brown, had reported hearing gunshots and then seeing an individual whose description matched plaintiff's—more on that issue shortly—holding a gun and fleeing the scene; and Keenan Holden had told Officer Okon and

---

[5] At oral argument, plaintiff's counsel suggested that plaintiff was not actually present at the time of the shooting, but that is not a reasonable interpretation of his allegations. The SAC's summary of events leading up to McMillen's shooting begins at paragraph 29, which states: "On September 1, 2014, Plaintiff Joshua Houston was an eighteen-year old black student. In the afternoon, he left his home in Calumet Park to accompany friends located at an address near 126th Street and Elizabeth Street in Calumet Park, Illinois." The next several paragraphs identify the friends who were present at that location; summarize the altercation; and assert that "someone from the group" of named friends shot and killed McMillen. SAC at ¶¶ 30-33. Plaintiff states in ¶ 34 that he was "in no way involved in the verbal argument [with] McMillen or his subsequent shooting," but he does not allege that he was not present at the time. The most natural reading of these allegations is that plaintiff was present for the altercation but did not argue with or shoot McMillen. Indeed, absent some allegation suggesting that plaintiff left the scene prior to McMillen's shooting, that is the only reasonable interpretation.

10

others that he saw plaintiff shoot at McMillen and provided other details about plaintiff's involvement the crime. Plaintiff does not dispute that taken at face value, these allegations suffice to establish probable cause for his arrest. He argues, however, that defendants also had exculpatory information (i.e., eyewitness accounts suggesting that someone whose appearance did *not* match plaintiff's shot McMillan), and that the incriminating evidence was the product of defendants' unlawful manipulation and fabrication whose purpose was to suggest falsely that plaintiff was McMillen's shooter.

It is true that an officer cannot falsify evidence, then turn around and rely on that evidence to support a judicial finding of probable cause. *See Lewis v. City of Chicago*, 914 F.3d 472, 476 (7th Cir. 2019). But that is not the story that emerges from the SAC. The allegations instead describe inconclusive witness statements with conflicting accounts of the individual(s) seen holding and/or firing a gun then leaps to the conclusion that defendants somehow "knew" which of the potential suspects was the true killer. Departing from that unsupported premise, the SAC engineers a conspiracy on the theory that any evidence tending to incriminate plaintiff must have been the product of defendants' unlawful manipulation of the investigation to further their presumptive plot to frame him.

While nothing in the complaint suggests why defendants would rig the investigation to finger plaintiff for a crime they knew he didn't commit, plaintiff's counsel offered a theory at oral argument. He stated: "I believe the police knew who the shooter was, and they manipulated evidence, manipulated reports, manipulated testimony in an effort to use [plaintiff] as a guinea pig in their investigation." Tr. of 06/13/2019 Hr'g., at 6. Counsel continued:

> I speculate that the police charged Mr. Houston with an offense with the hope that he would either implicate the real shooter or that either someone else would come forward with the hope to not have Mr. Houston prosecuted for a crime he didn't commit, or that the actual shooter would come forward and not have Mr. Houston prosecuted...for a crime that he didn't commit.

*Id*. at 12. But this admittedly speculative theory runs into several hurdles.

The most obvious is that it rests on factual foundations that are not pled in the complaint and paints an incomplete picture of the facts that *are* alleged. Counsel argued that although "every eyewitness said that the person who shot the individual had long dreadlocks," defendants nevertheless homed in on plaintiff, who had "short hair." Hr'g. Tr. at 5. The SAC does not support either part of this argument. First, it says nothing about plaintiff's hair. Second, even assuming that plaintiff's hair was "short," that feature does not exclude him from the universe of possible shooters. Indeed, "Debo," who plaintiff claims Holden identified

12

as McMillen's shooter in his "accurate statement" to officers on September 2, also had short hair. SAC at ¶¶ 30, 70. And while it is true that Tabitha Burton—the only witness who allegedly saw shots fired—described a dreadlocked shooter, she also saw a *second* shooter, described only as "a male black." SAC at ¶¶ 44-45, 48. Meanwhile, Sandra Brown described seeing two "light skinned" individuals running from the scene, both of whom had short hair, and one of whom was "holding a handgun." *Id*. at ¶¶ 56, 59. Based on counsel's representations at oral argument, that description closely matches plaintiff's appearance.[6] In short, the eyewitness descriptions of the suspects simply are not the compelling proof plaintiff's counsel suggests that defendants "knew" someone other than plaintiff was McMillen's shooter.[7]

The speculative nature of plaintiff's claims is likewise clear from his allegations that Nedved and Leyden: 1) "changed" Brown's witness statement to make it appear as though she had gotten a good look at the suspects; and 2) "prevented" Brown from viewing a lineup that included other suspects they believed she would identify, while singling out plaintiff in "an overly suggestive and coercive" physical lineup. Plaintiff offers no

---

[6] Counsel described plaintiff as a "lighter-skinned individual" with "short hair." Tr. of 06/13/2019 Hr'g. at 5:10-14.

[7] Although plaintiff's counsel stopped short of identifying the individual(s) plaintiff believes shot McMillen, the theory I derive from his allegations is that both Jenkins and Jarod Houston fired at McMillen, with Houston delivering the fatal shot to the head.

factual basis for inferring that Nedved and Leyden reported Brown's observations inaccurately.[8] And his suggestion that they "changed" her statement for the purpose of bolstering her anticipated future identification of plaintiff as the individual she saw holding a gun rests on multiple layers of conjecture. When plaintiff's assumption about defendants' "preordained" plan is stripped away, all that is left of these allegations is that Nedved and Leyden recorded the suspects as fleeing in the wrong direction and that Holden, Neely, and Jenkins were not included in the lineups Brown viewed. These facts do not raise a plausible inference that defendants participated in a conspiracy to manipulate the evidence to incriminate plaintiff.

The same is true of the SAC's allegations that Okon, Daley, and Rodriguez coerced Holden into falsely implicating plaintiff in McMillen's murder. At the outset, "threatening" Holden with prosecution does not amount to unlawful coercion given the SAC's allegations about Holden's involvement in the altercation with McMillen. *See United States v. Miller*, 450 F.3d 270, 272 (7th Cir. 2006), *abrogated on other grounds by Kimbrough v. U.S.*, 552 U.S. 85 (2007). And while police officers obviously are not permitted to use or threaten physical violence to coerce a witness statement, the SAC does not allege that Holden made any incriminating

---

[8] Indeed, the SAC does not make clear what plaintiff believes Brown told these defendants.

statements bearing on the probable cause analysis as a result of coercion by Daley or Rodriguez, who allegedly interrogated Holden for the first time on September 3, 2014—after plaintiff's arrest. And while plaintiff does allege that Holden incriminated plaintiff as a result of Okon's coercion on September 1-2, coerced testimony "may be true or false," *Petty v. City of Chicago*, 754 F.3d 416, 422 (7th Cir. 2014) (quoting *Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014), and nothing in the SAC (other than plaintiff's speculation) suggests that defendants knew Holden's incriminatory statements were false. *See also Beauchamp v. City of Noblesville, Inc.*, 320 F.3d 733, 743 (7th Cir. 2003) ("the police are under no constitutional obligation to exclude all suggestions that the witness...is not telling the truth.").

At all events, defendants need not have believed that plaintiff was "the shooter" to have had probable cause to arrest and detain him in connection with the incident. As defendants point out, the Illinois Accountability Statute provides that "[a] person is legally accountable for the conduct of another when ... [e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 Ill. Comp. Stat. Ann. 5/5-2(c) (West 2003). Assuming the accuracy of counsel's representations about plaintiff's physical appearance, it was reasonable for

15

defendants to believe, based on Brown's description and Keenan's statements, that plaintiff was holding and perhaps shot a gun in the course of Keenan's murder, even without clear evidence that plaintiff shot the fatal bullet(s). That is sufficient to establish probable cause for his arrest. *See Monroe v. Davis*, 712 F.3d 1106, 1120 (7th Cir. 2013) (evidence of intent to aid in the commission of a crime supports liability under accountability theory).

The pleading standards of Rule 8 are not high, but they require a plaintiff to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Lewis v. City of Chicago*, 914 F.3d 472, 476 (7th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Well-pleaded facts in the complaint are taken as true, but speculative or conclusory allegations "merely reciting the elements of the claim are not entitled to this presumption of truth." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). If the inference that defendants have engaged in wrongdoing derives from complex factual allegations, the plaintiff must inform the defendants "how, in the plaintiff's mind at least, the dots should be connected." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). Because the only thing connecting the "dots" of plaintiff's claims is his speculation about defendants' collective knowledge and intent, the SAC fails to "raise a right to relief above the speculative level." *Bell Atl. v. Twombly*, 550

U.S. 544, 555 (2007). Untethered from plaintiff's unsupported assumptions, the alleged facts pointing to plaintiff's involvement in McMillen's murder establish probable cause for his arrest and prosecution. This conclusion is fatal to each of plaintiff's substantive claims. And absent an underlying violation, plaintiff's derivative claims fall away as well.

III.

For the foregoing reasons, defendants' motion to dismiss is granted in its entirety.[9]

**ENTER ORDER:**

_Elaine E. Bucklo_
**Elaine E. Bucklo**
United States District Judge

Dated: July 26, 2019

---

[9] Any motion to amend the complaint shall be filed within fourteen days of this order. If no motion is filed within that time, the case will be dismissed with prejudice.